**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Senior Judge Richard P. Matsch**

Civil Action No. 12-cv-01742-RPM

NAIF AL-YOUSIF

    Applicant,

v.

TRAVIS TRANI, Warden, Colorado State Penitentiary, and
JOHN W. SUTHERS, Attorney General of the State of Colorado

    Respondents.

---

**MEMORANDUM OPINION AND ORDER**

---

Naif Al-Yousif is serving a sentence of imprisonment for life without parole resulting from a jury verdict finding him guilty of felony murder, robbery, accessory after the fact, concealing death, and theft by receiving. On direct appeal, the Colorado Court of Appeals vacated Al-Yousif's theft by receiving conviction, merged the robbery and felony murder convictions, and affirmed the trial court in all other respects. *See People v. Al-Yousif*, 206 P.3d 824 (Colo. App. 2006) ("*Al-Yousif II*"). The Colorado Supreme Court initially granted certiorari on a question of state law, but then denied it as having been improvidently granted. [Doc. 11, Ex. B.] The Court thereafter denied Al-Yousif's petition for rehearing. [*Id.*, Ex. C.] Al-Yousif sought post-conviction relief under Colo. R. Crim. P. 35(c). He was unsuccessful.

Al-Yousif filed this Application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, represented by Brett D. Lampiasi as his counsel. The Application asserted fourteen claims

for relief; Al-Yousif has since withdrawn seven of them.[1]   The primary contention in Al-Yousif's Application is that his convictions are invalid because incriminating statements he made to police interrogators while in custody were admitted into evidence at trial even though they were obtained in violation of his Fifth Amendment rights under *Miranda v. Arizona*, 388 U.S. 436 (1966).

## FACTUAL BACKGROUND

Habeas courts reviewing state court judgments must presume that the factual findings of the state court are correct unless there is clear and convincing evidence showing otherwise. 28 U.S.C. § 2254(e)(1).   The Colorado Court of Appeals summarized the facts of Al-Yousif's case, and Al-Yousif does not dispute them here.   Accordingly, the Court presumes the following to be a correct recitation of the evidence:

> On January 10, 2001, [Al-Yousif's] cousin, Mishal Al–Swaidy (Mishal), and brother, Rashid Al–Yousif (Rashid), picked up the victim[2] from the airport. Rashid dropped Mishal off at the home Mishal shared with defendant and Tariq Al–Dossary (Tariq). Rashid then dropped the victim off at his apartment with plans to see him for dinner.
>
> The victim did not appear for dinner, and a few days later, the victim's family called Rashid from Saudi Arabia looking for the victim. Rashid and a friend went to the victim's apartment. The apartment had been vandalized, and the victim's new car was missing. A missing persons report was filed on January 18, 2001.
>
> Police and private investigators hired by the victim's family uncovered the fact that the car had been sold back to the dealership and that checks had been cashed from the victim's checking account. When Rashid was shown the surveillance tape from the bank, he identified defendant and Tariq as the persons cashing the checks.
>
> Defendant was arrested on January 31, 2001 when he returned to Colorado. Defendant told the police that on January 10, he picked up the victim at his apartment and brought him to the home occupied by Mishal, Tariq, and defendant. Defendant reportedly left the house and went to the grocery store, and when he returned thirty

---

[1] In his Response, Al-Yousif withdrew Claims Two, Seven, Ten, Eleven, Twelve, and Thirteen.  [*See* Doc. 18.]  Al-Yousif subsequently withdrew Claim Fourteen.  [*See* Doc. 42.]

[2] The victim's name was Abdulaziz Al-Kohaji.  [Doc. 19, Ex. 3 at 1.]

minutes later, he found the victim tied to a chair. Tariq demanded that the victim give him money and the codes for his bank accounts. Tariq then put a rope around the victim's neck and strangled him to death while defendant and Mishal watched. Tariq and Mishal then took the victim's body to a bathroom and took his wallet. Tariq gave defendant the victim's ID card.

Tariq then went to the victim's apartment and stole various items from it. When Tariq returned, he, Mishal, and defendant put the victim's body into a garbage bag and dumped it into a garbage container. Defendant drove a rental car while they disposed of the body.

Defendant and Tariq took the victim's car to the dealership, sold it using the victim's identification, and then went to the bank and cashed the dealership's check plus $1,000 of the victim's cashiers' checks. They also took $19,900 from the victim's checking account. Mishal and Tariq reportedly fled to Saudi Arabia. Defendant fled to California, but Rashid convinced him to return to Colorado, where he was arrested, charged, and convicted of the above-mentioned offenses.

*Al-Yousif II*, 49 P.3d at 828.

# DISCUSSION

Before addressing the merits of Al-Yousif's Application, the Court must first consider two arguments advanced by Respondents: (1) that the Application is untimely, and (2) that Al-Yousif has failed to exhaust some of his claims.

## A. Timeliness

Under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), a habeas application generally must be filed within one year from when the state judgment becomes final by the conclusion of direct review or the expiration of time for seeking direct review. 28 U.S.C. § 2244(d)(1)(A). If a judgment is challenged in a state's highest court on direct appeal but is not challenged in the U.S. Supreme Court, the state judgment is final after 90 days. *Gonzales v. Thaler*, 132 S. Ct. 641, 656 (2012); *see also* Sup. Ct. R. 13(1) (certiorari petition must be filed within 90 days of state court judgment). If postconviction proceedings are then initiated, the AEDPA limitations period is tolled until the state supreme court denies

certiorari or the time for such a petition expires.  *See Serrano v. Williams*, 383 F.3d 1181, 1187 (10th Cir. 2004).

On direct appeal, the Colorado Supreme Court denied Al-Yousif's petition for a rehearing in an order dated **April 7, 2008**.  Al-Yousif did not file a certiorari petition with the U.S. Supreme Court.  [Doc. 1 at 18.]  Accordingly, the AEDPA's one-year limitations period began to run on **July 7, 2008**—90 days after April 7, 2008.  *See Holland v. Florida*, 130 S. Ct. 2549, 2555 (2010).

From July 7, 2008 to April 13, 2009, **281 days ran** against the AEDPA limitations period.  *See id*.

Al-Yousif filed a Motion for Postconviction Relief on **April 14, 2009**, which tolled the AEDPA limitations period.  After making its way through the state district and appeals courts, the Colorado Supreme Court denied certiorari on Al-Yousif's postconviction motion on **April 9, 2012**.  [Doc. 11, Ex. D.]  The AEDPA clock then started running again.  *See Serrano*, 383 F.3d at 1187.

From April 9, 2012 to Monday, July 2, 2012, **84 days ran** against the AEDPA limitations period.  Given the previous 281 days that ran between Al-Yousif's direct appeal and his initiation of postconviction proceedings, the AEDPA's 1-year statute of limitations expired on **Monday, July 2, 2012**.  Al-Yousif filed his habeas Application with this Court three days later, on **July 5, 2012**.  [Doc. 1 at 19.]

Al-Yousif maintains that, because Colorado Rule of Appellate Procedure 40(a) allows for a petition for rehearing to be filed within 14 days after a certiorari petition is denied, the AEDPA limitations period remained tolled for 14 days after April 9, 2012, when the Colorado Supreme Court denied certiorari on his postconviction motion.  [Doc. 18 at 5.]  On

that logic, Al-Yousif had an additional 14 days to file his habeas Application.  The problem with this argument is its premise.  Colorado Rule of Appellate Procedure 40(a) provides that "[a] petition for rehearing may be filed within fourteen days after entry of judgment . . . ." Colo. R. App. 40(a) (emphasis added).  Thus, a judgment is the only trigger for the rule's 14-day period for filing a petition for rehearing.  The Colorado Supreme Court has held "that [the] denial of a petition for certiorari does not constitute a determination of issues on the merits." *Bovard v. People*, 99 P.3d 585, 593 (Colo. 2004).  It follows that a certiorari denial is not a "judgment" that would authorize a party to petition for rehearing under Appellate Rule 40(a).  Thus, April 9, 2012—the day the Colorado Supreme Court denied certiorari on Al-Yousif's postconviction motion—is the proper date from which the AEDPA limitations period began to run again.

There is also an issue as to the effect of the date that the Colorado Supreme Court's denial of Al-Yousif's petition for rehearing on direct appeal was recorded in the electronic Registry of Actions by the trial court.  The Colorado Supreme Court's order was dated April 7, 2008.  [*See* Doc. 11, Ex. C.]  The trial court did not memorialize that order until April 10, 2008, and the Registry of Actions lists April 10, 2008 as the relevant date.  [Doc. 11, Ex. A at 8.]  There is no reference to an April 7, 2008 Supreme Court order in the system.  Al-Yousif's attorney relied on the Registry to calculate the time for filing under the AEDPA.  Using an operative date of April 10, 2008, Al-Yousif argues that July 5, 2012, the day he filed his habeas Application, was the final day of the AEDPA limitations period.  [Doc. 1 at 20.]  Respondents respond that the April 7, 2008 date is controlling.  Assuming that Respondents are correct, this is a case for application of the doctrine of equitable tolling.

In *Holland v. Florida*, 130 S. Ct. 2549 (2010), the Supreme Court recognized that equitable tolling may extend the AEDPA limitations period in appropriate cases. To apply equitable tolling, the district court must determine that (1) the petitioner has pursued his rights diligently and (2) that extraordinary circumstances beyond his control stood in the way of the timely filing of his petition. *Garza v. Wyo. State Penitentiary Warden*, No. 13-8032, 2013 WL 3306408, at *3 (10th Cir. July 2, 2013) (citing *Pace v. DiGuglielmo,* 544 U.S. 408, 418 (2005)).

The diligence required for equitable tolling is "reasonable diligence," not "maximum feasible diligence." *Holland*, 130 S. Ct. at 2565. Here, the record indicates that Al-Yousif retained Mr. Lampiasi as habeas counsel around the time the Colorado Supreme Court denied certiorari on Al-Yousif's motion for postconviction relief. Because 281 days had already run, counsel had 84 days to review a case with a complex procedural history, determine a strategy, and draft a 21-page habeas Application raising fourteen claims of error. It was reasonable for counsel to rely on the Registry of Actions to calculate the date on which the AEDPA limitations period would expire. In these circumstances, the Court concludes that counsel for Al-Yousif exercised reasonable diligence in pursuing Al-Yousif's rights. *Cf. Butler v. Walsh*, 846 F. Supp. 2d 324, 331 (E.D. Pa. 2012) (habeas petitioner reasonably diligent where "petitioner filed four days late after having only three months to research and write his petition").

The inaccurate recording of the date of the Colorado Supreme Court's order denying rehearing was an extraordinary circumstance beyond counsel's control. The State maintains its Registry of Actions exclusively, and it is the only public notice of the entry of court

orders.  Al-Yousif's counsel reasonably relied on that public record in calculating the days remaining in the AEDPA limitations period.

Accordingly, the Court concludes that equitable tolling applies to render Al-Yousif's Application timely.

## B.  Exhaustion & Procedural Default

A habeas application will not be granted unless the applicant has exhausted state remedies or no adequate state remedies are available or effective to protect the applicant's rights.  28 U.S.C. § 2254(b)(1).  To exhaust, the federal claim must have been "fairly presented" to the state courts.  *Castille v. Peoples*, 489 U.S. 346, 351 (1989).

The parties agree that Al-Yousif has exhausted Claims Three, Five (b), Six, and Eight. Respondents contest exhaustion of the other claims.  For one group of claims, Respondents argue that they were not fairly presented to any state appellate court, and are now barred.  As to another group of claims, Respondent argues that they are unexhausted because they were presented to the Colorado Court of Appeals, but not to the Colorado Supreme Court.

### 1.  Group One – Claims One (a), (b), (c); and Nine

a.  Claims One (a) and (b)

In Claims One (a) and (b), Al-Yousif contends that his "Sixth Amendment rights" were violated because the trial court gave the jury unfettered access to transcripts of his and his brother's videotaped police interviews during its deliberations.  [Doc. 1 at 12.]  Al-Yousif raised these issues on direct appeal to the Colorado Court of Appeals [Doc. 11, Ex. F at 14-18], and in his petition for a writ of certiorari to the Colorado Supreme Court [*id.*, Ex. G at 13-18].  Respondent argues that the claims were not "fairly presented" to those courts

because Al-Yousif framed them in terms of Colorado Rule of Civil Procedure 47(m)[3] and a passing mention of due process, not the Sixth Amendment. [*See* Doc. 11 at 32.] Al-Yousif concedes that he did not invoke the Sixth Amendment, but nonetheless argues that, by asserting his due process rights, his briefing "was sufficient to alert the [state courts] about his federal constitutional claims." [*See* Doc. 18 at 8.]

Fair presentation "require[s] a state prisoner to present the state courts with the same claim he urges upon the federal courts." *Picard v. Connor*, 404 U.S. 270, 275-76 (1971). To do so, the prisoner need not invoke "talismanic language" or cite "book and verse on the federal constitution," *Nichols v. Sullivan*, 867 F.2d 1250, 1252 (10th Cir. 1989), as long as he presents the "substance of the claim" to the state courts, *Demarest v. Price*, 130 F.3d 922, 932 (10th Cir. 1997). "It is not enough to make a general appeal to a constitutional guarantee as broad as due process to present the 'substance' of such a claim . . . ." *Gray v. Netherland*, 518 U.S. 152, 163 (1996); *accord Cole v. Zavaras*, 349 Fed. Appx. 328, 331 (10th Cir. 2009) (no exhaustion where, in state briefing, habeas petitioner "[stated] in conclusory fashion that the alleged error violated his federal constitutional rights, but . . . [cited] no federal case law to support those claims and [did] little to connect the claim with the rights he alleged were violated").

Here, as in his state court pleadings, Al-Yousif argues that giving the jury unlimited access to the transcripts tainted the fairness of his trial because it led the jury to over-emphasize them. The factual basis of his claims remains substantially the same. But the

---

[3] Colorado Rule of Criminal Procedure 57(b) provides that if a procedure is not specified in the Colorado Criminal Rules, courts "shall look to the Rules of Civil Procedure" and proceed in any lawful manner not otherwise inconsistent with the governing rules. Because the Colorado Criminal Rules do not discuss what materials jurors may have with them during their deliberations, Colorado courts have relied upon Colorado Rule of Civil Procedure 47(m) when the issue has been raised in criminal cases. *See, e.g., People v. Montoya*, 773 P.2d 623, 625-26 (Colo. App. 1989).

legal theory has changed.  In his Opening Brief to the Colorado Court of Appeals, Al-Yousif devoted four pages of argument to this issue.  [Doc. 11, Ex. F at 14-18.]  His introductory statement generally referred to his "right to a fair trial," and "due process" was mentioned in a footnote.  However, Al-Yousif did not once cite or discuss a federal constitutional provision or a federal case concerning federal constitutional guarantees.  Al-Yousif's actual argument focused on Colorado Rule of Civil Procedure 47 and Colorado cases interpreting it.  [*See id.* at 15-17.]  None of those cases invoked the Sixth Amendment in support of their conclusions.  The Colorado Court of Appeals' analysis of Al-Yousif's claim was likewise rooted in Colorado Rule of Civil Procedure 47 and made no explicit mention of a due process or Sixth Amendment claim.  *See Al-Yousif II*, 206 P.3d at 828-29.  Al-Yousif's certiorari petition to the Colorado Supreme Court more forcefully asserted Al-Yousif's "due process rights," but his argument was still dominated by a discussion of cases applying Colorado Rule of Civil Procedure 47.  [*See* Doc. 11, Ex. G at 2, 12-18.]  Again, Al-Yousif did not cite a federal constitutional provision or a federal constitutional precedent.

Al-Yousif's appeals to due process and to his right to a fair trial, as well as his generalized complaints about prejudice and unfairness, reasonably call a Sixth Amendment claim to mind.  But his emphasis on a state rule of procedure and his failure to refer to federal constitutional doctrine denied the Colorado courts "a fair opportunity to apply controlling legal principles to the facts bearing upon his constitutional claim."  *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (per curiam) ("It is not enough that all the facts necessary to support the federal claim were before the state courts . . . or that a somewhat similar state-law claim was made.").  Therefore, Al-Yousif has failed to show that he exhausted Claims One (a) and (b) in the state courts.

If a habeas petitioner's claim is unexhausted, and it is "clear" that the claim would be barred under state procedural law if the petitioner returned to state court to exhaust it, the federal habeas court should consider the claim procedurally defaulted. *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991); *Thomas v. Gibson*, 218 F.3d 1213, 1221 (10th Cir. 2000). The state procedural law in question is Colorado Rule of Criminal Procedure 35(c)(3)(VII) ("Rule 35"), which provides that, subject to certain exceptions, "[t]he court shall deny any claim that could have been presented in an appeal previously brought or postconviction proceeding previously brought." Without question, Al-Yousif could have presented Claims One (a) and (b), as he raised all of the facts needed to support the claims to assert his similar state-law claim. None of the exceptions to Rule 35 apply. It is clear that a Colorado court would deem Claims One (a) and (b) procedurally defaulted if Al-Yousif returned to state court to exhaust them.

A petitioner can overcome procedural default by showing cause and prejudice, or by establishing that a failure to review the claim will result in a fundamental miscarriage of justice. *Bland v. Sirmons*, 459 F.3d 999, 1012 (10th Cir. 2006). Al-Yousif has not pressed cause, prejudice, or a fundamental miscarriage of justice with regard to Claims One (a) and (b). Accordingly, Al-Yousif failed to exhaust Claims One (a) and (b) and he is procedurally barred from raising those claims here.

b. Claim One (c)

In Claim One (c), Al-Yousif argues that the trial court violated his Sixth Amendment rights by denying the jury's request for deposition transcripts of two defense witnesses. [Doc. 1 at 12.] Al-Yousif did not present the issue in his opening or reply briefs on direct appeal, and only raised it for the first time in a petition for rehearing. *Al-Yousif II*, 206 P.3d

at 829.  The Colorado Court of Appeals, citing a Colorado Supreme Court case for the proposition that all claims must be presented in an opening brief, therefore declined to consider it.  *Id.*

When a prisoner violates a state procedural rule that leads to default on his claim, and the procedural rule is an independent and adequate state ground for the state court's decision, the prisoner may not raise the claim in federal habeas, absent a showing of cause and prejudice or actual innocence.  *Coleman*, 501 U.S. at 731.  "A state procedural ground is independent if it relies on state law, rather than federal law, as the basis for the decision."  *Hickman v. Spears*, 160 F.3d 1269, 1271 (10th Cir. 1998) (internal quotes and citation omitted).  The state ground is adequate where it is "strictly or regularly followed and applied evenhandedly to all similar claims."  *Id.* (internal quotes and citation omitted).

The Colorado Court of Appeals' decision not to consider Claim One (c) is based on an independent state ground, because it cites to a Colorado Supreme Court opinion, which in turn relies on an earlier state decision.  *See People v. Casey*, 521 P.2d 1250, 1253 (Colo. 1974).  This rule is clear, firmly established, and applied evenhandedly, *see People v. Salinas,* 55 P.3d 268, 270 (Colo. App. 2002), and is therefore an adequate ground for decision.  Moreover, Al-Yousif has not shown that external circumstances prevented him from raising the claim earlier in the proceedings to establish cause for his procedural default.  He has also failed to establish actual innocence, such that a failure to review this claim will result in a fundamental miscarriage of justice.  Claim One (c) is procedurally defaulted.

c. <u>Claim Nine</u>

Al-Yousif argues in Claim Nine that his "due process rights were violated" when the state trial court denied his request for a new trial based on newly discovered evidence—

specifically, a sworn statement from Mishal stating that Al-Yousif only participated in the wrongdoing because Tariq threatened him with a gun. [Doc. 1 at 16; Doc. 11, Ex. E at 15 (sworn statement).] To meet the fair presentment requirement, the ground relied upon in the state court must be "presented face-up and squarely." *Kelley v. Sec'y for Dept. of Corrections*, 377 F.3d 1317, 1345 (11th Cir. 2004). Exhaustion demands more than drive-by citation, detached from any articulation of an underlying federal legal theory; conclusory, scattershot citations of federal constitutional provisions is therefore insufficient to exhaust. *Castillo v. McFadden*, 399 F.3d 993, 1002 (9th Cir. 2005).

Al-Yousif's discussion of newly-discovered evidence in state court, both in his opening brief in the Colorado Court of Appeals and in his certiorari petition to the Colorado Supreme Court, focused on Rule 35 and Colorado Supreme Court case law interpreting that Rule. [*See* Doc. 11, Ex. H at 27-28; Ex. I at 15-16.] He then concluded as follows:

> Because the newly discovered evidence of the co-defendant's sworn statement is material and substantial, and would likely result in acquittal at retrial, the trial court erred in denying the motion for post-conviction relief without a hearing. <u>U.S. Const., Amend. VI, XIV</u>; *Colo. Const., Art. II, Sec. 16, 25; Colo. R. Crim.P. 35(c)(v)*.

[Doc. 11, Ex. H. at 32, Ex. I at 18 (italics in original, underline added).]

That underlined citation to the Fourteenth Amendment is the only reference Al-Yousif made to Claim Nine in state court. Unsurprisingly, the Colorado Court of Appeals decided this issue based on its application of Rule 35 and made no mention of due process or federal law. [*See* Doc. 6, Ex. 1 at 10-12.] Accordingly, Al-Yousif failed to fairly present Claim Nine to the Colorado courts. *See Duncan v. Henry*, 513 U.S. 364, 366 (1995) (claim based on state procedural rule did not "fairly present" federal due process claim to state court); *Casella v.*

*Clemons*, 207 F.3d 18, 21 (1st Cir. 2000) ("[A]n isolated federal-law bloom in a garden thick with state-law references" will not serve to exhaust) (citation omitted).

As with Claims One (a) and (b), it is clear that a Colorado court would deem Claim Nine procedurally defaulted under Rule 35 if Al-Yousif returned to state court to pursue it. Al-Yousif argues that Mishal's sworn statement establishes a colorable showing of actual innocence, such that the court should review Claim Nine regardless of his default. To support a claim of actual innocence, Al-Yousif must provide new, reliable evidence that was not presented at trial, and show that, based on the new evidence and the evidence presented at trial, "it is more likely than not that no reasonable juror would have convicted him." *Schlup v. Delo*, 513 U.S. 298, 327 (1995).

Mishal's sworn statement, if deemed credible, would corroborate and support Al-Yousif's duress theory. Mishal gave an earlier sworn statement in which he described Al-Yousif as a willing participant in the robbery and murder—specifically, that Al-Yousif tied his cousin to the chair, and strangled him with a wire—and made no mention of Tariq threatening Al-Yousif with a gun. [Doc. 11, Ex. K at 6-7.] That earlier statement undermines the reliability of the post-trial statement. Given the contradiction between Mishal's statements and the other evidence supporting Al-Yousif's complicity in the crime, it cannot be said that "no reasonable juror would have convicted him" had Mishal testified to the content of this out-of-court statement. *Schlup*, 513 U.S. at 327. Thus, Al-Yousif has not made out a colorable claim of actual innocence based on Mishal's new sworn statement.

For these reasons, Claim Nine is procedurally defaulted.

### 2.   Group Two – Claims One (d); Four; and Five (a)

For this group of claims, Respondents concede that they were fairly presented to the Colorado Court of Appeals, but argue that they were not properly exhausted because Al-Yousif did not raise them with the Colorado Supreme Court.   [*See* Doc. 11 at 110.]   Al-Yousif contends that these claims are exhausted by operation of Colorado Appellate Rule 51.1(a) ("Rule 51.1(a)").

Under Rule 51.1(a), when a claim has been presented to the Court of Appeals, and relief has been denied, "the litigant shall be deemed to have exhausted all available state remedies."   According to Respondents [Doc. 11 at 38-39], regardless of that rule, Al-Yousif still "has the right" to raise these claims before the Colorado Supreme Court, and therefore, he does not satisfy the definition of exhaustion under the federal habeas statute.   *See* 28 U.S.C. § 2254(c) ("An applicant shall not be deemed to have exhausted . . . , if he <u>has the right</u> under the law of the State to raise, by any available procedure, the question presented.") (emphasis added).   But "there is nothing in the exhaustion doctrine requiring federal courts to ignore a state law or rule providing that a given procedure is not available."   *O'Sullivan v. Boerckel*, 526 U.S. 838, 847-48 (1999).   That is exactly what Rule 51.1(a) does: once a litigant raises a claim before the Court of Appeals, and relief is denied, "all <u>available</u> state remedies" are deemed unavailable.   Rule 51.1(a) does not require a litigant to raise a claim in the Colorado Supreme Court if he has already raised it in the Colorado Court of Appeals and been denied relief.   Four circuit courts of appeal have determined that state rules similar to Colorado Appellate Rule 51.1(a) eliminate the need to seek review in the state's highest court to satisfy the exhaustion requirement.   *See Lambert v. Blackwell,* 387 F.3d 210, 233 (3d Cir. 2004); *Adams v. Holland,* 330 F.3d 398, 401–03 (6th Cir. 2003); *Randolph v. Kemna,*

276 F.3d 401, 404–05 (8th Cir. 2002); *Swoopes v. Sublett,* 196 F.3d 1008, 1009–10 (9th Cir.

1999).  Al-Yousif has therefore exhausted Claims One (d), Four, and Five (a).

## C.  Merits of Claims

Under the AEDPA, habeas relief may not be granted as to claims adjudicated on the

merits in state court unless the state court decision was "contrary to, or involved an

unreasonable application of, clearly established Federal law, as determined by the [U.S.

Supreme Court]," 28 U.S.C. § 2254(d)(1), or was "based on an unreasonable determination

of the facts in light of the evidence presented in the State court proceeding." *Id.* §

2254(d)(2).  Each of the following claims must be reviewed under this standard.

### 1.  Claim Five

In Claim Five, Al-Yousif asserts that his confession to police was obtained (a)

involuntarily, and (b) in violation of his Fifth Amendment rights under *Miranda v. Arizona*,

384 U.S. 436 (1966).  [*See* Doc. 1 at 14.]  The Court will address Claim Five (b) first, as it is

the central claim in Al-Yousif's Application.

### Claim Five (b) - *Miranda* waiver

Al-Yousif contends that the incriminating statements he made to police interrogators

were inadmissible because he did not knowingly and intelligently waive his *Miranda* rights.

A *Miranda* waiver must be knowing and intelligent to comport with the Fifth Amendment.

To be knowing and intelligent, a waiver must be "made with a full awareness of both the

nature of the right being abandoned and the consequences of the decision to abandon it."

*Moran v. Burbine*, 475 U.S. 412, 421 (1986).  Courts review the validity of a waiver by

analyzing the totality of the circumstances surrounding the interrogation.  *Id.*

Al-Yousif first raised this issue in a pre-trial motion to suppress.  The trial court held a hearing over the course of four days, in which it heard testimony and received other evidence.  It made the following findings of fact:

> Detective Guigli arrested defendant . . . and transported him to Denver Police headquarters. During this brief ride, defendant said, "I know all about it" or words to that effect and seemed eager to talk to the detectives. Detective Guigli gave him a brief oral advisement of his rights and told him to be quiet until they reached headquarters.

> Beginning at approximately 8 a.m. on January 31, 2001, defendant was interviewed in a video interview room at Denver police headquarters. The interview was conducted by Detective Guigli and Detective Mike Martinez of the homicide unit. They were joined during the course of the interview by Detective Schneider, also a homicide detective. The interview was videotaped, and the videotape was received in evidence (Exhibit 2).

> Approximately three minutes into the interview, after introductions and obtaining basic information about defendant's identity, Detective Martinez read defendant his <u>Miranda</u> rights from Exhibit 1. This was introduced by "I've gotta go over some paperwork before we start talking here, ok?" Detective Martinez read the four rights at once, without pausing or offering any additional explanation, and then asked defendant if he understood. Defendant nodded and mumbled something that sounds like an affirmative response. Detective Martinez asked him if he was sure, and defendant said yes. This entire advisement consumed approximately 18 seconds. The form was not turned so defendant could read along. Detective Martinez checked off each of the rights as he read it but did not have defendant initial each right. Detective Martinez wrote defendant's answer (yes) when he said he understood. Detective Martinez then turned the form to defendant and told him, "I need your signature here to show you were the person advised of your rights." Defendant signed his name without reading anything. Detective Martinez then said, "It says here, 'knowing my rights and knowing what I am doing, I now wish to voluntarily talk to you.' To talk with us, I need your signature on that line." He pointed to the signature blank in the waiver portion of Exhibit I; defendant looked at the bottom portion of the form for a few seconds and then signed his name again. Defendant asked no questions about the advisement.

> Detective Martinez did not use the police department's video advisement form but did ask defendant if any promises or threats had been made to get him to make this statement, which defendant did not seem to understand. When this question was repeated, defendant said, "What's a statement?" Defendant ultimately agreed that no promises or threats had been made, that he was not under the influence of drugs or alcohol, that he was making the statement voluntarily, and that he understood that it was being videotaped. In the midst of this portion of the advisement, defendant stated for the first time that he was not going to talk until the victim's uncle comes. The interview then proceeded.

At no point during the first interview was defendant asked about his understanding of English or whether he wanted an interpreter. Neither Detective Martinez nor Detective Guigli considered looking for an interpreter. Detective Martinez testified that defendant's English was "perfectly fine;" in fact he said he did not know if English is defendant's first language. This I found to be incredible. Defendant's name, appearance and thick accent should have alerted anyone that he was not a native speaker of English. Detective Guigli did know defendant was from Saudi Arabia and had spoken to defendant's brother and members of the victim's family. He had not asked anyone about defendant's fluency in English.

There is a marked contrast between the first interview and the second <u>Miranda</u> advisement done that afternoon by Detective Vigil. Detective Vigil began by asking defendant how long he had been in this country, where he had gone to school, if defendant understood him and if defendant had understood everything that morning. Defendant answered "Uh-huh" and added that he sometimes has a problem understanding but agreed to ask for an explanation if he did not understand. Detective Vigil then read each right separately and offered some explanation or paraphrase and asked defendant if he understood after each right. Defendant said he understood. When Detective Vigil made clear that defendant could have a lawyer sitting with him in the interview, defendant immediately said, "I want a lawyer." The interview then terminated.
. . .

Early in the first interview, defendant said he was not going to talk until the victim's uncle comes. Detective Guigli said in response, "You understand we have to talk first," to which defendant replied, "We'll talk." Minutes later, defendant said, "I don't feel like talking until his uncle comes." Detective Guigli's response was, "We can't bring the uncle into this interview." Defendant then continued to answer questions. In addition to these requests to speak to the victim's uncle, defendant made requests prior to the interview to make phone calls to various people, all of which Detective Guigli denied.

Defendant stated that he was good friends with the victim and that his father and the victim's father worked for the same company in Saudi Arabia. He claimed to have spoken to the victim's uncle about the story his two roommates were telling (blaming defendant for the murder) and had agreed to tell the uncle everything when he came to Colorado. Defendant said his understanding was that in Saudi Arabia, all three of them might be beheaded, but that it was up to the parents of the victim to say what the punishment should be. Later, towards the end of the interview, the detectives explained that in this country, the case would be decided by a judge and jury, not the victim's parents. Defendant felt that he would not go to prison and asked the detectives what would happen if the uncle said he should be let go.

[Doc. 19, Ex. 3 at 4-7.]  Three expert witnesses who viewed the interrogation videotape and

the *Miranda* advisement form testified that Al-Yousif did not understand his rights or the

consequences of his waiver due to cultural and linguistic limitations.  [*See id.* at 5-6.]  One of the experts, Dr. Kholwadia, testified that the right not to talk to the police was foreign to Al-Yousif because no such right exists in Saudi Arabia, and that Al-Yousif's nodding in response to police questioning might have indicated that he needed further explanation because, in Arab culture, nodding may indicate a lack of understanding.  The other two, Professor Slakey and Jeanne Hind, who both taught Al-Yousif English, testified that, like other intermediate students, Al-Yousif would nod and say he understood what was being said when he was actually missing much of the meaning.  Professor Slakey also testified that Al-Yousif had reached a fifth-grade level of English proficiency, and that comprehension of the *Miranda* advisement requires a seventh-grade reading level for a native speaker.

The trial court framed the relevant legal standard as follows:  "To find a knowing and intelligent waiver, I would have to be convinced by a preponderance of the evidence that defendant was 'fully aware of the nature of the right to remain silent . . . and the consequences of abandoning that right.'"  [*Id.* at 8 (quoting *People v. Kaiser*, 32 P.3d 480, 484 (Colo. 2001).]  The trial court concluded that the State failed to show that Al-Yousif knowingly and intelligently waived his *Miranda* rights, based on the following factors:

1. The time interval between the advisement and the subsequent interrogation was very brief.

2. The detectives initiated the interview, although the defendant had earlier expressed some eagerness to talk with the detectives.

3. There was no effort to remind defendant of his rights or give a fuller explanation of them during the course of the interrogation.

4. Defendant's acknowledgment of the rights and his waiver were so perfunctory as to be meaningless for a person with defendant's background. The advisement was cursory, at best. The rights were read in a matter of seconds, and defendant was not even given the opportunity to read along with Detective Martinez. Unlike Detective Vigil,

Detective Martinez did not stop after each right and paraphrase or ask a question to make sure defendant understood. Further, Detective Martinez derogated the importance of the rights by putting them in the context of "getting some paperwork out of the way." Detective Martinez made no effort to have the defendant initial each of the rights, and his having defendant sign the form in two places was done in a manner that made it appear to the defendant that he had no choice but to sign.

5. The interview demonstrates defendant did not understand that he had the right to remain silent when defendant twice says he wants to talk to the victim's uncle first. This was obviously important to defendant, apparently for cultural and family reasons. If defendant had appreciated that he had an absolute right not to talk with the detectives, he would have insisted on waiting for the uncle to arrive. Instead, he kept talking when his requests were denied.

6. The definitive demonstration that defendant did not understand the rights the first time around is his reaction when the rights were properly explained to him by Detective Vigil. He immediately stated that he wanted a lawyer. Although some time had passed between the first advisement and the second advisement, that does not explain how defendant had such a different reaction to hearing the same rights.

7. Although defendant could converse in English, his abilities, according to his peers and the expert witnesses, were limited. As demonstrated in Detective Vigil's advisement, he had sufficient ability in English that he could have been advised in a manner that he would have understood, and he could have had the opportunity to make an intelligent choice. However, that was not done.

8. Defendant's cultural background as a citizen of Saudi Arabia made it impossible for him to understand and absorb the <u>Miranda</u> warning without further explanation or elaboration. Defendant had no prior experience with the American system of criminal justice and no grasp of the right of a suspect to refuse to answer police questioning. His expectations about the controlling influence the victim's family would have on the process show his profound lack of understanding of criminal justice in the United States. His spending time watching "gangster movies" is not a substitute for an understandable advisement.

9. Defendant's age, experience, education, and background have all been considered as described in the factors above. He displayed no lack of intelligence that would have impeded his understanding of an effective explanation of his rights.

[*Id.* at 8-9.]   Accordingly, the trial court ordered that Al-Yousif's statements to Denver Police be suppressed.

On interlocutory appeal, the Colorado Supreme Court concluded that the trial court demanded too much for a *Miranda* waiver, stating:

> The trial court in this case applied a legal standard concerning the meaning of "knowing" and "intelligent" that included aspects of tactical understanding that surpass what is required for a supportable *Miranda* advisement and waiver. Under our de novo review of the trial court's conclusion, we look to whether the defendant minimally understood that he did not have to talk to the police, that he could request a lawyer, and that, if he spoke, what he said could be used against him to obtain a conviction. Measuring that legal standard against the trial court's findings of historical fact, and our own review of the videotape, we determine that Al–Yousif's waiver of his *Miranda* rights was sufficiently knowing and intelligent to pass constitutional muster.

*People v. Al-Yousif*, 49 P.3d 1165, 1172 (Colo. 2002) ("*Al-Yousif I*"). Applying that framework, the Court held that Al-Yousif's waiver was valid because: (1) Al-Yousif had English abilities adequate for casual conversation; (2) the police interrogators read Al-Yousif the *Miranda* warnings in unbroken, quickly read, but short sentences, which mitigated Al-Yousif's limited ability to comprehend lengthy, rapidly spoken sentences; (3) Al-Yousif asked the interrogators for clarification when he did not understand what they were saying, but he asked no questions during the reading of the *Miranda* warnings; and (4) Al-Yousif acknowledged that he understood the *Miranda* rights when they were read to him. *See id.* at 1171-72. The Court's conclusion was based on its own, independent review of the interrogation videotape and some of the trial court's findings of fact. *See id.* at 1171.

Under 28 U.S.C. § 2254(d)(1), a decision is "contrary to" federal law if a state court applies a rule different from the governing law set forth in Supreme Court precedent, or if it decides a case differently from the Supreme Court on a set of materially indistinguishable facts. *Bell v. Cone*, 535 U.S. 685, 694 (2002). Relief under the "unreasonable application" clause is appropriate if the state court correctly identifies the correct governing principle but

unreasonably applies it to the facts. *Id.* The application must be objectively unreasonable, which is different from and more egregious than merely being incorrect. *Id.* "[T]he more general the rule at issue—and thus the greater the potential for reasoned disagreement among fair-minded judges—the more leeway [state] courts have in reaching outcomes in case-by-case determinations." *Renico v. Lett*, 559 U.S. 788, 776 (2010) (quotations omitted).

      i.    *"Contrary to"*

To evaluate the opinion of the Colorado Supreme Court reversing the trial court's suppression ruling, it is helpful to review the majority opinion in *Miranda v. Arizona*, 384 U.S. 436 (1966). After discussing information concerning police interrogation practices, the Court reached this conclusion:

> [W]ithout proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely. In order to combat these pressures and to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored.

*Id.* at 467. The Court's holding was succinctly stated:

> [T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.[4] As for the procedural safeguards to be employed, unless other fully effective means are devised to inform accused persons of their right of silence and to assure a continuous opportunity to exercise it, the following measures are required. Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and

> indicates in any manner that he does not wish to be interrogated, the police may not question him. The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned.

*Id.* at 444-45.   Given the inherently compelling pressures of custodial interrogation, the state's exclusive control over that process, and the importance of preserving the Fifth Amendment guarantee, the Court stated that:

> [A] heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel. *Escobedo v. Illinois*, 378 U.S. 478, 490, n. 14, 84 S.Ct. 1758, 1764, 12 L.Ed.2d 977. This Court has always set high standards of proof for the waiver of constitutional rights, *Johnson v. Zerbst*, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), and we re-assert these standards as applied to in-custody interrogation.

*Id.* at 475 (emphasis added).   In a later opinion deciding *Moran v. Burbine*, 475 U.S. 412 (1986), the Court characterized the core principle of *Miranda* as follows:

> Police questioning, often an essential part of the investigatory process, could continue in its traditional form, the Court held, but only if the suspect clearly understood that, at any time, he could bring the proceeding to a halt or, short of that, call in an attorney to give advice and monitor the conduct of his interrogators.

*Id.* at 426-27.

In evaluating Al-Yousif's waiver, the Colorado Supreme Court reduced the *Miranda* protection to this statement:

> The trial court in this case applied a legal standard concerning the meaning of "knowing" and "intelligent" that included aspects of tactical understanding that surpass what is required for a supportable *Miranda* advisement and waiver. Under our de novo review of the trial court's conclusion, we look to whether the defendant minimally understood that he did not have to talk to the police, that he could request a lawyer, and that, if he spoke, what he said could be used against him to obtain a conviction.

*Al-Yousif I*, 49 P.3d at 1172.  That standard differs materially from the governing law and principles set forth above.  It is not sufficient that the defendant "minimally understood" his choices, *see id.*; the interrogators must assure that he is fully aware of the nature of his rights and the consequences of his decision to waive them, *see Burbine*, 475 U.S. at 421.  The difference is of particular significance in this case because, while the record showed that Al-Yousif had some basic linguistic comprehension of the words in the *Miranda* advisement, it also showed that he did not clearly understand the meaning and significance of the advisement as a whole.  As the trial court found, the defendant did not understand the American criminal justice system, and his perception of his rights was substantially colored by his familiarity with the criminal justice system in Saudi Arabia.  These findings were supported by Al-Yousif's multiple requests to speak with the victim's uncle.  The Colorado Supreme Court failed to recognize the importance of those requests.

A state court's use of imprecise language is not significant if it can be determined from the record that the state court understood the correct standard.  *Holland v. Jackson*, 542 U.S. 649, 655 (2004).  The record here shows that the Colorado Supreme Court neither stated nor applied the *Miranda* requirements.  The Court counted up the English words it perceived Al-Yousif to understand, reviewed the eighteen seconds of the videotape in which the *Miranda* advisement occurred, and apparently based largely on its own findings, concluded that Al-Yousif's waiver was knowing and intelligent, in disregard of the trial court's findings to the contrary.  *See Al Yousif I*, 49 P.3d at 1171-72.  The Supreme Court's limited analysis and ultimate conclusion failed to give full effect to the Fifth Amendment's requirement that police be certain that the accused clearly understands his rights and the consequences of waiving them.

23

The Colorado Supreme Court's statement of what is required for a valid *Miranda* waiver is contrary to clearly-established Supreme Court precedent, and is therefore contrary to federal law within the meaning of the AEDPA.

   ii. *"Unreasonable application"*

In addition to its legal error in minimizing *Miranda*, the Colorado Supreme Court's application of the totality-of-circumstances test was objectively unreasonable. In determining whether a particular defendant's waiver was knowing and intelligent, courts must consider the totality of circumstances. *Burbine*, 475 U.S. at 421. Factors to consider include, but are not limited to, the defendant's age, experience, education, background, and intelligence. *Fare v. Michael C.,* 442 U.S. 707, 725 (1979); *North Carolina v. Butler*, 441 U.S. 369, 374-75 (1979). The trial court made detailed factual findings on all of the relevant factors, and the Colorado Supreme Court determined those findings to be largely irrelevant to its analysis. It emphasized Al-Yousif's ability to understand English words but did not appreciate his apparent failure to understand the meaning of those words in the context of what was confronting him as a prisoner suspected of first-degree murder. The difference between the first advisement given to Al-Yousif and that given later by Detective Vigil is stark—the former was given in cursory, rapid fashion, while the latter was given in simpler terms and with full explanation, resulting in Al-Yousif invoking his right to an attorney. The Colorado Supreme Court largely discounted the trial court's reasonable inference from that difference: if the *Miranda* warnings had been adequate, Al-Yousif would not have given police the statements that became the most significant evidence at his trial.

The Court's majority opinion was countered by a strong dissent by Justice Bender, joined by Justice Martinez. According to the dissenters, the majority

[failed] to credit the importance of the numerous historical findings of fact made by the trial court, including the fact that the defendant had substantial language and cultural barriers that impeded his ability to understand, and therefore to waive, his *Miranda* rights.

*Al-Yousif I*, 49 P.3d at 1173 (Bender, J., dissenting). That failure was an objectively unreasonable application of the totality-of-the-circumstances test. The Colorado Supreme Court's ruling regarding Al-Yousif's *Miranda* waiver was erroneous "beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 131 S. Ct. 770, 786-87 (2011). This Court agrees with the trial court and the dissenters: "If the type of advisement given here is found to be sufficient, the advisement requirement becomes a sham." *Al-Yousif I*, 49 P.3d at 1177 (Bender, J., dissenting) (quoting trial court).

### iii. Harmless error

In cases governed by the AEDPA, when a habeas court determines that a state court ruling is contrary to or involves an unreasonable application of Supreme Court precedent, it must then apply the harmless error standard set out in *Brecht v. Abramson*, 507 U.S. 619 (1993). *Herrera v. Lemaster*, 301 F.3d 1192, 1200 (10th Cir. 2002) (en banc). Thus, Al-Yousif is only entitled to habeas relief if he can show that the prosecution's use of his statements to police "had a substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637. Here, neither side has provided guidance on this question; Respondents do not mention harmless error, and Al-Yousif's discussion of the issue does not extend beyond rote conclusions of law. [*See* Doc. 18 at 32-33.] Nonetheless, the record clearly shows that the interrogation videotape was the most significant evidence supporting Al-Yousif's convictions for felony murder, accessory after the fact, and concealing death, as it detailed, in his own words, the events surrounding Al-Kohaji's

abduction and murder, and the disposal of his body.   [*See* Doc. 19, Ex. 2.]   There was minimal other evidence admitted establishing that sequence of events.[4]   The prosecution: relied on Al-Yousif's statements to police in its opening statement at trial [*see* Al-Yousif Trial Transcript, Oct. 9, 2003 at 64-66 (on file)]; admitted the videotape into evidence and played significant portions of it for the jury [*see id.*, Oct. 10, 2003 at 13-15][5]; and relied heavily on Al-Yousif's statements during closing argument [*see id.*, Oct. 23, 2003 at 115:5-126:6; 194:7-10 ("The defendant confessed.   He used his own words to explain this.   Go back and look at the video tape.   Look at it to tell to you that you can't figure this out.")].   And during its deliberations, the jury asked for the videotape and received it, along with a transcript.   *Al Yousif II*, 206 P.3d at 828-29.   It is clear that the prosecution's use of Al-Yousif's statements had a substantial and injurious effect on the jury's verdict.

Claim Five (a) - Voluntariness

In Claim Five (a), Al-Yousif contends that his statements to police were made involuntarily.   Under the Fourteenth Amendment due process clause, a statement that is involuntarily made may not be used at trial.   *Brown v. Mississippi*, 297 U.S. 278 (1936).   A statement is involuntary if coercive police activity played a significant role in inducing the statement.   *Colorado v. Connelly*, 479 U.S. 157, 167 (1986).   In determining voluntariness, a court must consider the totality of the circumstances surrounding the statement.   Following a

---

[4] The Court notes that, as to the conduct furnishing the basis for Al-Yousif's predicate robbery conviction, the prosecution presented substantial evidence besides the interrogation videotape establishing that Al-Yousif withdrew money from the victim's account and sold the victim's car.

[5] The trial transcript is unclear as to which portions of the tape were played at trial, specifically.   The transcript simply says "(The tape was played for the jury)".   [*Id.*, Oct. 10, 2003 at 14:18.]   The Court can infer from the record that the videotape was played for approximately 1.5 hours.   [*See id.* at 9:1 (proceedings began at 9:02 a.m.); 15:1 (tape stopped and recess taken at 10:37 a.m.).]   Al-Yousif's attorney, Mr. Lozow, characterized Al-Yousif's statement to police as being 1.5 hours in duration.   [*Id.* at 33:8-9.]   In any event, the jury had access to the full videotape during its deliberations.

suppression hearing, the trial court determined that Al-Yousif's statements to Denver Police were voluntarily given, after finding that:

> (1) defendant knew the detectives were investigating a homicide and were talking with him because they believed he knew what happened to the victim; (2) there were no threats or overt promises made to defendant; (3) the tactics used by the detectives were not coercive or improper; and (4) defendant's mental and physical condition was acceptable.

*Al-Yousif II*, 206 P.3d at 834 (describing trial court decision). On interlocutory appeal, the Colorado Supreme Court did not disturb or address the trial court's findings and voluntariness ruling. Following his conviction, Al-Yousif argued on direct appeal that the police coerced his statement because he was aggressively questioned by three detectives, who inappropriately referred to his religion and made improper statements regarding the punishment he would receive if he were returned to Saudi Arabia. [*See* Doc. 11, Ex. F at 28-29.] The Colorado Court of Appeals concluded, without analysis, that Al-Yousif's statement was voluntary, accepting the trial court's findings after "examining the record." *See Al-Yousif II*, 206 P.3d at 834-35.

Al-Yousif contends that the state courts' application of the totality of the circumstances test was objectively unreasonable. [*See* Doc. 18 at 29-30.] In determining that Al-Yousif's statement was voluntary, the trial court emphasized the absence of threats, promises and coercive tactics by the police; Al-Yousif's physical and mental condition; and Al-Yousif's comprehension of why police were questioning him. *Al Yousif II*, 206 P.3d at 834. The trial court also considered circumstances indicating coercion, such as Al-Yousif being in custody and not free to leave, and not having the opportunity to confer with family and friends in spite of repeated requests. *See Al-Yousif I*, 49 P.3d at 1184-86. All of these considerations are a part of the totality of circumstances test as it has traditionally been applied. *See*

*Arizona v. Fulminante*, 499 U.S. 279, 285-88 (1991); *Haynes*, 373 U.S. at 513-15.  The trial court's ultimate decision that Al-Yousif's statement was voluntarily given reflected a reasonable balancing of these circumstances.  Therefore, the trial court's decision—and the Court of Appeals' decision summarily affirming it—were not erroneous "beyond any possibility for fairminded disagreement." *Harrington*, 131 S. Ct. at 786-87.[6]

Al-Yousif maintains that the Colorado Court of Appeals' decision was based on an incomplete factual record, which requires this Court to (1) review the voluntariness issue *de novo* and (2) hold an evidentiary hearing so Al-Yousif can prove facts that do not appear in the record.  [*See* Doc. 1 at 14-15.]  These arguments are unavailing.  On habeas review, a state court's findings of fact are presumed correct, and the habeas applicant has the burden of rebutting that presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  The trial court's record from the suppression hearing is an adequate factual basis for the Colorado Court of Appeals' decision, and Al-Yousif does not provide this Court with a single record citation to rebut the trial court's findings of fact, nor does he allege that the trial court erroneously ignored facts in the record.  Second, Al-Yousif's desire to develop new evidence that did not previously appear in the record is misplaced, since AEDPA review "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011).

For these reasons, Al-Yousif is not entitled to habeas relief on Claim Five (a).

---

[6] Al-Yousif also argues that, because he lacked English comprehension and was unfamiliar with the U.S. criminal justice system, the state courts should have applied Supreme Court case law analyzing the voluntariness of juvenile confessions to Al-Yousif's circumstances, even though he acknowledges that he was not a juvenile at the time of the interrogation.  [*See* Doc. 18 at 30.]  However, Al-Yousif does not cite a single case supporting the notion that the extreme caution applied to juvenile confession cases should apply to non-juveniles under special circumstances.

### 2.   Claim One (d) – Right to a Fair Trial and Confrontation

In Claim One (d), Al-Yousif argues that his constitutional rights were violated by the court's refusal to allow him to be present while jurors watched the videotape of his interview with police.

An analytical prerequisite to a habeas claim is that there be "clearly established" federal law on the claim of error.   *House v. Hatch*, 527 F.3d 1010, 1017-18 (10th Cir. 2008). Respondents maintain that, to their knowledge, there are no constitutionally-based Supreme Court decisions on the right of a defendant to be present in the jury room while the jury watches a video interview entered into evidence [Doc. 11 at 82-84], and further note that different jurisdictions have taken varying approaches to this issue [*see id.* at 83-84 (collecting cases)].   This is an invitation for Al-Yousif to direct the Court to clearly-established, relevant federal law, but he cites none in his Response.   [*See* Doc. 18.]   Instead, he maintains that the AEDPA standard of review – and thus, the clearly-established requirement – should not apply because the Colorado Court of Appeals did not adjudicate Claim One (d) on the merits. [*Id.* at 35.]   But the Colorado Court of Appeals' opinion is informed by relevant facts, and is based in federal due process, which is what he argued on direct appeal.   *See Al-Yousif II*, 206 P.3d at 828.   That is sufficient for it to have adjudicated this claim on the merits within the meaning of 28 U.S.C. § 2254(d).   *See Parker v. Matthews*, 132 S. Ct. 2148, 2153 (2012) (per curiam, 9-0) ("This claim was rejected on the merits by the Kentucky Supreme Court (albeit without analysis) and therefore receives deferential review under the AEDPA standard.").

Because the AEDPA applies, and because Al-Yousif has failed to cite to any clearly established federal law governing Claim One (d), this claim must be denied.

### 3.   Claims Three, Six, and Eight – Ineffective Assistance of Counsel

Al-Yousif claims ineffective assistance of counsel in violation of the Sixth Amendment. A conviction will not be reversed due to ineffective assistance of counsel unless the defendant proves constitutionally-deficient performance by counsel and resulting prejudice. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).   To show prejudice, a defendant must prove a reasonable probability—i.e., "a probability sufficient to undermine confidence in the outcome"—that, but for counsel's unprofessional errors, "the result of the proceeding would have been different." *Id.* at 689.   When a habeas court applies the AEDPA to review a state court's ineffective assistance of counsel decision, the standard is highly deferential. *Harrington*, 131 S. Ct. at 788 ("[T]he standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so.")

#### a.   Claim Three – Choice of Evils Defense

In Claim Three, Al-Yousif maintains that his trial counsel was ineffective because he did not act on the trial court's request to submit an offer of proof for a choice-of-evils defense. [Doc. 1 at 12-13.]   Under Colorado law, a choice-of-evils defense is not available in addition to a duress defense "unless separate facts exist which warrant its application."   Colo. Rev. Stat. § 18-1-708.   Because the jury was instructed on duress, trial counsel's failure to provide separate facts supporting choice of evils resulted in the trial court's refusal to instruct the jury on that defense. *See Al-Yousif II*, 206 P.3d at 831.

Both the trial court and the Colorado Court of Appeals denied Claim Three in postconviction proceedings.   [*See* Doc. 11, Ex. E at 3-6 (trial court); Doc. 6, Ex. 1 at 3-4 (appeal).] According to the Court of Appeals, Al-Yousif's postconviction motion failed to allege separate facts that would independently warrant application of the choice-of-evils

defense; therefore, the defense would have been barred by Section 18-1-708 even if trial counsel had tendered an offer of proof.   [Doc. 6, Ex. 1 at 4.]   The Court of Appeals concluded, as a consequence, that the lack of an offer of proof did not cause Al-Yousif prejudice within the meaning of *Strickland*.   [*See id.*]

Al-Yousif does not argue that the Court of Appeals' holding is contrary to Supreme Court precedent, and no case has been cited showing any comparable facts.

Turning to the "unreasonable application" prong of the AEDPA, as the Colorado Court of Appeals pointed out, Al-Yousif failed to allege in his postconviction motion, some six years after his conviction, any independent facts supporting an offer of proof to render trial counsel's failure to offer proof prejudicial.   Second, even if trial counsel had made an offer of proof with sufficient independent facts, it is questionable that the trial court would have ruled, as a prerequisite for jury consideration under C.R.S. § 18-1-702(2), that "the claimed facts and circumstances would, if established, constitute justification."   [*See* Doc. 11, Ex. E at 6 (District Court Order denying Al Yousif postconviction relief) ("Defendant's speculative fears and many opportunities to remove himself from the ongoing crime do not rise to the level of an impending injury demanding immediate action" to warrant invocation of choice of evils defense).]   Third, the jury was instructed on a duress defense, which is substantially similar to choice of evils (particularly in the context of being threatened by another person), and yet the jury convicted Al-Yousif.   Al-Yousif makes much of the fact that choice of evils is a defense to felony murder, while duress is not, to assert that he was "effectively left without a defense to the charges against him."   [Doc. 18 at 38.]   However, duress is a defense to robbery, and robbery was the predicate crime for the State to prove felony murder here. The jury found that Al-Yousif participated in the robbery on his own volition even though he

raised duress as a defense.  For these reasons, it was reasonable for the Court of Appeals to conclude that it was unlikely that the trial would have turned out differently had trial counsel tendered an offer of proof on choice of evils.  The court did not unreasonably apply *Strickland*'s prejudice standard to Claim Three.

Finally, the Colorado Court of Appeals' decision was not based on an unreasonable determination of the facts given the evidence presented.  The only facts Al-Yousif alleged in his state postconviction proceedings were essentially procedural recitations of trial counsel's back and forth with the trial court on whether and how to establish a foundation for choice of evils.  [*See* Doc. 11, Ex. J at 16-18, Ex. H at 11-16.]  He did not at any point identify facts constituting independent grounds for a choice-of-evils defense.  In the absence of such facts, and given the record before it, the Court of Appeals made a reasonable determination that trial counsel could not have presented facts necessary for a choice-of-evils instruction.

Accordingly, Al-Yousif is not entitled to habeas relief on Claim Three.

b.  Claim Six – Motion to Suppress Under Vienna Convention Article 36

In Claim Six, Al-Yousif argues that his trial counsel was ineffective because he did not move to suppress Al-Yousif's confession to police on the basis that the police violated Al-Yousif's rights under Vienna Convention Article 36 by questioning him in the absence of a consular officer.  [Doc. 1 at 15.]  The Colorado Court of Appeals denied Al-Yousif post-conviction relief on this claim, because "suppression [of evidence] is not the proper remedy for a violation of the Vienna Convention rights of a foreign national."  [Doc. 6, Ex. 1 at 7-8.]

Claim Six fails because there is no clearly established Supreme Court case law holding that the Vienna Convention creates an individually enforceable right that would require suppression as a remedy for a violation.  The Supreme Court has said, in a per curiam

opinion, that the Vienna Convention "<u>arguably</u> confers on an individual the right to consular assistance following arrest." *Breard v. Greene*, 523 U.S. 371, 376 (1998) (emphasis added); *see also United States v. Minjares-Alvarez*, 264 F.3d 980, 986 (10th Cir. 2001) ("It remains an open question whether the Vienna Convention gives rise to any individually enforceable rights."). The lack of any clearly established federal law is "analytically dispositive" under AEDPA review, *Hatch*, 527 F.3d at 1017-18; relief on Claim Six is denied.

c.   <u>Claim Eight – Failure to Object to Erroneous Jury Instruction on Complicity</u>

In Claim Eight, Al-Yousif maintains that his trial counsel was ineffective because he did not object to a jury instruction regarding accomplice liability.  [Doc. 1 at 16.]  The Colorado Court of Appeals determined that Al-Yousif was not prejudiced because the instruction had no bearing on the jury's determination that Al-Yousif participated in the robbery, which formed the basis of his felony murder conviction.  [Doc. 6, Ex. 1 at 6-7.][7]

In his postconviction pleading, Al-Yousif emphasized his claim of error in the complicity instruction, arguing that "the jury <u>could have</u> mistakenly concluded that they were required to find Mr. Al-Yousif guilty, even if they did not find that he had participated in the robbing or killing of the victim."  [Doc. 11, Ex. J at 20 (emphasis added).]  In finding Al-Yousif guilty of felony murder, the jury must have found that Al-Yousif participated in the robbery, and that the victim was killed in the course of or in the furtherance of the robbery.  [*See* Doc.

---

[7] Al-Yousif argues, presumably in the hopes that this Court will review the issue *de novo*, that the Colorado Court of Appeals refused to reach the merits of Claim Eight because it did not cite federal case law and only vaguely referenced the *Strickland* prejudice prong.  [*See* Doc. 18 at 50.]  However, "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington*, 131 S. Ct. at 784-85.  Here, the Colorado Court of Appeals recognized Al-Yousif's claim to be governed by *Strickland*, and concluded, paraphrasing the prejudice prong, that "there is no reasonable probability that, but for counsel's failure to object to the complicity instruction, defendant would have been acquitted of felony murder."  [Doc. 6, Ex. 1 at 4.]  Accordingly, Al-Yousif has not shown that Claim Eight was not "adjudicated on the merits" within the meaning of 28 U.S.C. § 2254(d).  *See Parker*, 132 S. Ct. at 2153.

6, Ex. 1 at 6-7.]  Al-Yousif failed to meet his burden of proving a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different.  *See Strickland*, 466 U.S. at 689.[8]  The Colorado Court of Appeals' decision was an appropriate application of *Strickland*, and was based on a reasonable determination of the facts given the evidence presented.  Habeas relief on Claim Eight is denied.

### 4.  Claim Four – Prosecutorial Misconduct

In Claim Four, Al-Yousif argues that his rights to due process and a fair and impartial jury were violated when the prosecutor:  (1) asked the jury to hold him (the prosecutor) – and not law enforcement – accountable for failing to provide discoverable information to the defense for over 14 months; (2) stated that Al-Yousif "lied" about using a fake driver's license; and (3) suggested that the jury would not be fulfilling its oath if it acquitted Al-Yousif.  [Doc. 1 at 12-13.]  Because Al-Yousif did not object to the prosecutor's conduct at trial, the Colorado Court of Appeals applied a plain-error standard on direct appeal, and rejected Al-Yousif's claim.  *Al-Yousif II*, 206 P.3d at 832-34.

In evaluating a claim of prosecutorial misconduct, the relevant inquiry is whether prosecutor's "conduct so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (citation omitted).  The "*Darden* standard is a very general one, leaving courts 'more leeway . . . in reaching outcomes in case-by-case determinations' . . . ."  *Parker*, 132 S. Ct. at 2155 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

---

[8] In support of his prejudice argument, Al-Yousif relies heavily on *Everett v. Beard*, 290 F.3d 500, 503 (3d Cir. 2002), *abrogated on other grounds as recognized in Rainey v. Varner*, 603 F.3d 189, 202 n.5 (3d Cir. 2010).  But there, the jury was erroneously instructed that the defendant could be found guilty of intentional first degree murder if his accomplice intended to cause the death of the victim, <u>and</u> the jury found him guilty on that theory.  Thus, to the extent *Everett* is relevant on habeas review (which it is not—*see* 28 U.S.C. § 2254(d)(1) ("clearly established federal law, <u>as determined by the Supreme Court</u>") (emphasis added)), it is distinguishable.

On direct appeal, the Colorado Court of Appeals recognized that the prosecutor's first and second statements were improper but ruled that they did not cast doubt on Al-Yousif's conviction.  That ruling was not contrary to, nor did it involve an unreasonable application of, the *Darden* line of cases.  Therefore, habeas relief is not warranted on the first and second grounds asserted by Yousif to support his prosecutorial misconduct claim.

Al-Yousif's third ground is weaker.  As the Court of Appeals noted, the "jury takes an oath that requires it to find a defendant guilty if the People prove the defendant's guilt beyond a reasonable doubt."  *Al-Yousif II*, 206 P.3d at 834.  The prosecutor's statement to the jury – "We have proven this case to you beyond a reasonable doubt.  And we ask that you fulfill your oath and find him guilty of these charges" – was not improper.

## D.  Conclusion

For the foregoing reasons, the Court concludes that Al-Yousif is entitled to habeas relief on Claim Five (b).  In fashioning a remedy, a habeas court has wide discretion to "dispose of the matter as law and justice require."  28 U.S.C. § 2243.  Exercising that discretion, the Court concludes that a conditional writ is appropriate here.  *See Hilton v. Braunskill*, 481 U.S. 770, 775 (1987) ("[T]his Court has repeatedly stated that federal courts may delay the release of a successful habeas petitioner in order to provide the State an opportunity to correct the constitutional violation found by the court.")

In all other respects, Al-Yousif's habeas Application is denied.  Under 28 U.S.C. § 2253(c), a prisoner may not appeal the denial of his habeas application unless the presiding court issues a certificate of appealability ("COA").  A COA is required where the petitioner to whom a writ has been granted on one ground asserts, in opposition to the state's appeal, a ground that the district court rejected.  *Jones v. Keane*, 329 F.3d 290, 296-97 (2d Cir. 2003).

A COA will not issue unless the prisoner makes "a substantial showing of the denial of a constitutional right." *Id.* This requires a prisoner to demonstrate "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003). The Court concludes that Al-Yousif's unsuccessful claims do not meet this standard. Thus, in the likely event Respondents appeal this decision, Al-Yousif is not entitled to re-assert them as additional bases for relief.

Upon the foregoing, it is

ORDERED that Naif Al-Yousif's Application for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 is granted. His convictions for felony murder, accessory after the fact, and concealing death were unconstitutionally obtained. The State of Colorado shall retry Naif Al-Yousif within 90 days, failing which he shall be released from custody.

Dated:  January 22, 2014.

BY THE COURT:

s/Richard P. Matsch

_____

Richard P. Matsch
Senior District Judge